LOS ANGELES GAS & ELECTRIC CORPORATION v. WESTERN GAS CONST. CO.

(Circuit Court of Appeals, Ninth Circuit. June 12, 1913.)

No. 2,159.

1. JUDGMENT (§ 256*)—FINDINGS—SUFFICIENCY TO SUPPORT—BREACH OF CONTRACT.

A special finding by the trial court that, in making a test of a gas generating apparatus required by the contract under which the apparatus was installed by defendant in plaintiff's plant, plaintiff failed to comply with the contract by furnishing the quality of fuel specified, *held* to sustain a judgment denying plaintiff recovery of the amount paid on the contract on its refusal to accept the apparatus, because on such test it did not develop the capacity called for.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 446–454; Dec. Dig. § 256.*]

2. APPEAL AND ERROR (§ 1008*) — SCOPE AND EXTENT OF REVIEW — ACTION TRIED TO COURT—FINDINGS OF FACT.

Where an action at law in a federal court is tried to the court, its findings upon questions of fact are conclusive in the appellate court, and the only matters reviewable are the rulings on questions of law, when properly presented by bill of exceptions, and when special findings are made, whether the facts found are sufficient to sustain the judgment.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3955–3960, 3962–3969; Dec. Dig. § 1008.*]

In Error to the District Court of the United States for the Southern Division of the Southern District of California.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Action at law by the Los Angeles Gas & Electric Corporation against the Western Gas Construction Company. Judgment for defendant, and plaintiff brings error. Affirmed.

Wm. A. Cheney, Herbert J. Goudge, and Le Roy M. Edwards, all of Los Angeles, Cal., for plaintiff in error.

Oscar A. Trippet and Ward Chapman, both of Los Angeles, Cal., for defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge. This action was brought by Los Angeles Gas & Electric Company, the predecessor in interest and assignor of the plaintiff in error, against the defendant in error, the Western Gas Construction Company, to recover $26,823.45 for the alleged breach of certain warranties of capacity in a contract for the construction of an extended carbureter superheater water gas apparatus, together with the expense of moving the apparatus from the premises of the gas company in the city of Los Angeles, where the latter company was engaged in the manufacture and distribution of illuminating gas.

The construction company was a manufacturer of gas generating machines, with its factory and principal place of business at Ft. Wayne, Ind. The original contract was made on the 8th of April, 1907, whereby the construction company agreed to sell and the gas company to purchase the gas apparatus described in the contract and particularly described in the specifications annexed to and made a part thereof; the purchase price being $35,694, payable in installments as the work progressed. Five months from the date of the contract was the time fixed for its complete installment. It was provided that the machine should have a capacity of from 2,800,000 to 3,200,000 cubic feet of gas per day of 24 hours, with the use of good anthracite coal or gashouse coke, and that with the use of lamp-black it should have a capacity of from 2,750,000 to 3,000,000 cubic feet per day of 24 hours, of from 20 to 22 candle power, using not more than 32 pounds of dried lamp-black or 35 pounds of lamp-black containing not more than 10 per cent. moisture per thousand cubic feet of gas made, and requiring not more than 4½ gallons of California crude oil of 17 degrees Baume, or over, per thousand cubic feet of gas. In the contract the gas company was designated as "owner" and the construction company as "contractor," and it provided that 50 per cent. of the contract price should be paid—

"in proportion as material is shipped or delivered to the premises of the owner; 25 per cent. of the contract price in such sums as may be called for from time to time during the progress of the work (said amount to include all payments for account of freights, advances to erectors and other sundry charges prior to the completion of the apparatus), and the balance of the contract price 35 days after acceptance of apparatus as herein provided."

The original contract also contained this clause:

"There are no understandings, promises, or agreements on the part of the owner or contractor outside of this contract and specifications noted above, together with terms, conditions, and limitations therein contained, excepting letter of contractor to owner, dated April 8th, to be and is hereby made a part of this contract."

The construction company proceeded with the work of installing the apparatus, but delay in doing so occurred, due, as the construction company claimed, to the fault of the gas company, and, as the gas company claimed, to the fault of the construction company. However that may be, the machine was not completed and ready for operation until the early part of 1908. After it was completed and put in operation, the gas company refused to accept it upon the ground that it had not the capacity and efficiency described in the guarantees. On the other hand, the construction company claimed that it had fully performed the contract and that the apparatus was fully capable of generating the quantity and quality of gas provided for and with the economy of fuel and oil specified in the guaranty. Payments had been made by the gas company to the construction company during the progress of the work aggregating $26,823.45, and in consequence of the controversy the gas company brought suit against the construction company for the rescission of the contract and the recovery of the money which was paid. The construction company contested the suit, and also filed a cross-complaint against the gas company for the recovery of the balance alleged to be due upon the contract, which suit remained pending for some time, but seems never to have been brought to trial. In July, 1909, the parties entered into negotiations for the settlement of the controversy, which negotiations resulted in a contract executed by them on the 12th day of July, 1909, which recited that:

"Whereas, the parties hereto did on the 8th day of April, 1907, enter into a contract by which the party of the first part herein [the construction company] agreed to furnish and install at the plant of the party of the second part [the gas company] an extended carbureter superheater water gas apparatus; and whereas, the said party of the first part did furnish and install at the plant of the party of the second part an extended carbureter superheater water gas apparatus, and the party of the second part did pay the party of the first part a portion of the contract purchase price therefor, to wit, twenty-six thousand eight hundred twenty-three and 45/100 ($26,823.45) dollars; and whereas, litigation has arisen between the said parties hereto concerning the question as to whether or not the said extended carbureter superheater water gas apparatus furnished and installed by the party of the first part as aforesaid was in accordance with said contract, and whether or not the said apparatus so furnished and installed could produce the amount of gas guaranteed in said contract; and whereas, the parties hereto now desire to finally dispose of and settle the controversy which has arisen between them concerning said apparatus: Now, therefore, be it agreed"

—in substance that the construction company should be given an opportunity to make a preliminary test of the apparatus for the purpose of determining what changes it desired to make in the same in order to put it in a proper condition for a final test, among which was the construction of a new generator or generators, the providing of means of collection and easy removal of dust and fine carbon carried from the generator to the carbureter, and ample and satisfactory means of scrubbing and condensing of the gas made, and that after the making of such changes the construction company would at once proceed "to make gas with said set, of the kind specified in said contract [of April 8, 1907], with the same economy of fuel and oil mentioned in said contract," and that if in the said test the construction company should

bring the apparatus to a gas-making capacity of 2,000,000 cubic feet per 24 hours "of the kind of gas mentioned in said contract, with the same economy of lamp-black fuel containing not more than ten (10%) per cent. moisture and oil mentioned in said contract," then the construction company would accept as full payment for the apparatus $26,000, and that the excess of $823.45 theretofore paid should be returned by the construction company to the gas company.

The contract of July 12, 1909, also contained provisions in respect to what the payments should be in the event the construction company should in the proposed test bring the apparatus to the capacity of more than 2,000,000 cubic feet of gas per 24 hours, which provisions it is not necessary to set out, and concluded with these clauses:

"And it is agreed that the capacity of said apparatus shall be determined solely as follows: The party of the first part shall notify the party of the second part when it is ready for the final test of said apparatus, and the average capacity per twenty-four (24) hours of said set during said test, which shall not be less than twenty (20) consecutive days, shall constitute the capacity of said apparatus for all the purposes hereunder.

"And the party of the first part agrees that if said party of the first part cannot, during said test, bring said apparatus to an established capacity, as herein defined, of at least two million (2,000,000) cubic feet per twenty-four (24) hours of the kind of gas specified in said contract, with the same economy of oil and lamp-black fuel containing not more than 10 (10%) per cent. of moisture mentioned in said contract, said party of the first part will remove at once, without any cost to the party of the second part, said apparatus from the premises of the party of the second part, and repay to said party of the second part all money heretofore paid or advanced by said party of the second part to said party of the first part under said contract, to-wit, twenty-six thousand eight hundred twenty-three and $45/100$ ($26,823.45) dollars."

The case shows that shortly after the making of the last contract the construction company started the preliminary test for the purpose of determining what changes in the apparatus to make, and shortly thereafter began to make such changes, which were completed, and after various delays from various causes the final test provided for was commenced at six o'clock a. m. of March 10, 1910. The first day the apparatus produced more than 2,700,000 cubic feet of gas, but the fuel consumed was in excess of 35 pounds of lamp-black per thousand cubic feet of gas. The second and third days considerably more than 2,000,000 cubic feet of gas was made, but the fourth day there was less than 2,000,000 feet made, on which day the apparatus was closed and the discovery made that the carbureter had become almost entirely clogged by a deposit of fine carbon or lamp black which blew over from the generator into the carbureter. It took three days to remedy that condition, and the apparatus was started again on the 17th of March, on which day the production of gas was but a little in excess of 2,000,000 cubic feet. During the succeeding seven days a production of more than 2,000,000 cubic feet per day was maintained, when the carbureter again became clogged and the production decreased rapidly until the last day of the test, which was March 30th, when the production was only 1,280,000 cubic feet of gas.

At the expiration of 20 days from the time the test started, to wit, on said 30th day of March, the gas company refused to permit the ap-

paratus to be operated any longer, claiming that the construction company had failed to make good its guaranty, and demanded the return of the $26,823.45. The construction company contended that there had been a substantial performance of the guaranties, notwithstanding its claim that the gas company failed to furnish the character of lamp-black required by the contract; that the result of such test as made showed that the apparatus had a larger capacity than 2,000,-000 cubic feet of gas per day, but that the conditions under which the apparatus was operated, and particularly the unfit character of the fuel furnished by the gas company had rendered a practical demonstration of what the apparatus was capable of doing impossible. The evidence showed that the defendant to the action offered to make another test under proper conditions and abide by the result, which offer the gas company refused, and thereupon brought the present action.

The defendant by its answer put in issue all of the allegations of the complaint in respect to its failure to comply with the terms of the contract, and by its cross-complaint set up, among other things, that the substance furnished by the gas company during the final test—

"as and for lamp-black was not furnished in a scientific shape, nor in the usual way, nor according to the understanding between the defendant and the Los Angeles Gas & Electric Company and the plaintiff, nor according to good practice for handling such stuff; but the said fuel was compressed into bricks with a great deal of moisture, to wit, more than 20 per cent., in the same, and was thereafter dried until the moisture was evaporated, so that the same, after said drying, contained less than 10 per cent. of moisture. And defendant alleges that said fuel should have been dried until it contained less than 10 per cent. of moisture, and then pressed into bricks. That by reason of the said fuel being compressed with more than 20 per cent. of moisture therein and then dried, the said fuel lost its strength, was easily broken, and fell to pieces and crumbled in handling, and was not held in the shape of bricks, and after the same was put into the fire, the same crumbled into dust, packing the fuel bed, seriously interfering with and preventing proper combustion.

"That the alleged lamp-black bricks so furnished by the plaintiff for the purpose of making said test and running said apparatus and set were first compressed and made into bricks while in a moist state, and were afterwards dried in ovens or kilns, thereby making the exterior of said brick drier than the interior, and making the adhesive properties of said alleged lamp-black of less tensile strength than if the said alleged lamp-black had been dried and then compressed, and when said bricks so furnished by the plaintiff were used, the moisture on the interior of said brick caused the said brick to expand on the interior more rapidly than on the exterior, and caused the brick to burst into fragments and into powder, and into its original state, thus smothering out the fire; and said bricks would not hold their shape nor stand the fire necessary to produce combustion to make gas. That said bricks were defectively molded, in that the molds were not filled with the material prior to their being compressed.

"That the conduct of said plaintiff in furnishing said brick in such shape is contrary to practice and contrary to good workmanship, and it compelled the defendant to shut down the apparatus three days to permit cleaning out the carbureter from accumulated fine carbon and other matters, which had closed up the gas passages, and thus necessitated the removal of brickwork and replacement of the same before gas making could be continued."

[1] It was upon the issue raised by this allegation that the trial court found against the plaintiff in error, and, as said in its brief, all the other material adverse findings made by the court "must stand or

fall with the finding" made upon that issue. That finding is as follows:

"Plaintiff did not perform the obligations undertaken by it in said contracts in this: That it did not, during said test, furnish lamp-black fuel of the quality called for by said contract; but, on the contrary, the lamp-black fuel furnished defendant during said test contained from 10 per cent. to 15 per cent. of impurities in the form of tar and other hydrocarbons, and a small percentage of noncumbustible ash, and which substances substantially diminished the gas-making efficiency of the fuel. But nevertheless the said lamp-black fuel so furnished was the lamp-black resulting as a by-product in the manufacture of gas at the plant of plaintiff, and was the lamp-black material referred to in the contracts of the parties, and was in brick form, and did contain less than 10 per cent. of moisture, and was in compliance with the contract, except as hereinafter set forth. But the said bricks so furnished had been prepared by being compressed with moisture largely in excess of 10 per cent., and the moisture then driven out, leaving voids therein, and had been insufficiently compressed, and were so unstable that they were not able to withstand, and did not withstand, the jarring necessarily incident to handling the same for fuel purposes in such apparatus. Notwithstanding the protests of the defendant during said test, plaintiff did furnish to defendant bricks which had been and were being, throughout the entire test, subjected to external artificial heat or kiln-drying for the purpose of driving out moisture therefrom, and did also furnish considerable quantities of bricks which were still warm from said fires, which rendered them unstable and easily disintegrated, and practically all the brick furnished to defendant during said test were of such an unsubstantial character that great quantities of them were necessarily broken up and crumbled in the handling of them, and that this crumbling and powdering took place to such an extent as that great quantities of fine pulverized and crumbled material unavoidably found its way into the generator, with the result that the fuel bed was packed and its efficiency largely impaired, and with the further result that excessive and extraordinarily large quantities of dust were blown over from the generator into the carbureter, and tended to form a deposit upon the brickwork in the carbureter, and to materially retard its function and impair its capacity."

It is insisted on behalf of the plaintiff in error that the foregoing finding is unsupported by the evidence, but a brief reference to the record is sufficient to show that the contention is not well founded. Take the testimony of the witness Pederson, for instance, who was Pacific Coast manager of the construction company. He testified that he arrived at the plant on the 12th of March; the test having been commenced, as has been said, on the 10th. We quote from his testimony:

"Q. What was the condition of the fuel that was being furnished at the time you arrived? A. At the time I arrived the fuel was in what I considered a rather poor condition, in the fact that it was creating a great deal of dust and crumbling with very slight handling. Q. And you took charge of the night shift? A. I did. Q. What hour did you get to work? A. I think on my arrival. I think I went to work right away, and worked right through till next morning. Q. What were the usual hours? A. From 6 o'clock in the evening till 6 in the morning. Q. Do you know whether the bricks sent you at that time were kiln-dried or not? A. Yes; I think I did know that; that is, I was not informed about that to that effect, but I could see them kiln-drying them, and the natural presumption would be that they were those bricks, and I knew they were furnishing those bricks. Q. What were the appearances? Were they a hard-looking, substantial brick, or otherwise? A. You could see fissures in them at all points, particularly longitudinally. These fissures were so wide and open that it would be a matter of very little difficulty in tearing the bricks apart. Q. But were the bricks capable of such handling as was necessary to put them in the fire? A. They were not, and

remain in anything like— Q. Describe the charging apparatus with respect to its feasibility for handling the fuel. A. I considered that charging apparatus to be rather a convenient affair, if the fuel was of the proper consistency. The wagon would drive up with this fuel over a pit—straddling the pit—and the driver would take off the sides and take off the scantling bed, and the bricks would drop down in a mass, one on top of the other, a drop possibly four or five feet. Then from there it would pass into what would be called a skip. By the raising of a door at the bottom part of this container, the drop there was not very severe. It was just a matter of two or three feet. Then it was hoisted to the top of the building, and the skip or bucket was tipped over, and the bricks allowed to shoot down into the upper bin and collect there, ready to be discharged into the generator through another spout, which was also built on an incline, and afforded a slide to the generator. Q. Have you handled these lamp-black bricks in various forms to any extent in your experience? A. During my experience here I have handled a good many of them. Q. Have you ever seen material dried first and then bricked? A. To 10 per cent.? Q. Yes. A. I have seen them to this extent: That I made brick myself on a little hand press with lamp-black containing 4 per cent. moisture, and made a fairly substantial brick, although not of the thickness of the bricks used here. That was because of the apparatus that I had to experiment with. It was just one of these little hand presses that they have in a brickyard. But the brick I considered was fairly substantial. With a power press I would say there was no difficulty at all to make a brick with a less percentage of moisture. My observation, and what I have learned from other sources, confirms me in that statement, and my general knowledge of the material. Q. Have you also handled bricks that were made from materials that were moist and then bricked? A. Yes, sir. Q. Moist to an extent greater than 10 per cent., and air-dried? A. Yes, sir. Q. Have you also handled bricks that were made up and then kiln-dried or fire-dried? A. I have. Q. Is there a difference in their consistency? A. There is. The sun-dried brick, if it is properly made, has a slower evaporation of the moisture contained in it than the kiln-dried brick, and in the evaporation of the sun-dried brick it seems that the binding material sets harder, whereas in the kiln-dried brick the moisture, being driven out at a rapid rate, seems to disintegrate the brick to a certain extent, and possibly also drives off a part of the binding material, so that the brick is not nearly so substantial if it is kiln-dried as if it is sun-dried. Q. What is this binding material that you refer to? A. It is a portion of tar and the lighter hydrocarbons. Q. Having in view your knowledge of the bricks made in these different ways, those that are substantial and those that are unsubstantial, I will ask you again if in your opinion the apparatus furnished there or installed there for the purpose of handling the fuel into the generator would have handled it in proper manner if the fuel was properly made and was a substantial brick? A. It would. Q. But with the material furnished during this test—the kiln-dried brick—did it so handle the fuel? A. It did not. By the time the bricks went through this process of being put in the skip and raised and slid down, it was disintegrated to the extent that at least 25 or 30 per cent. of it became actual dust, and that dust sifted through the slots that we had in the chute, and these slots being made naturally with spaces of iron between them —that is, a slot and a space of iron and then another slot—and the slots being an inch and a half in diameter and the strip of iron about two inches, about half of the surface of the slot would allow the dust to go through, and through these apertures 25 or 30 per cent. of the brick would go through in the form of dust. Now, on this other part where the slot was not made, there was always a quantity of dust that we could not get rid of because we did not have a shaking apparatus on that part which would have helped sift it through, and it slid through—the portion that happened to be over the slot would go through, and the rest would go into the machine. Q. Can you give us an idea of how much fine dust went into the machine? Q. (by the Court). What observation did you make? A. I was on the floor—not continuously, but off and on during the entire time—and possibly 75 per cent. of the time that we charged that machine. I wasn't there all the time. But every time we charged the machine we would be over there, and looked in there, and

saw the material come down, and we would observe the condition of the floor. Q. And you did that? A. I did that. I would say from my observation practically as much dust went into the machine as was sifted through; about the same proportion. Q. Did this dust or fine material evidence itself at any other place than going down the chutes and going through the slots? A. It evidenced itself in going over into the carbureter and chamber, and gathering there. Q. Is there a means provided for taking the dust that passes over— A. There is a means provided for taking it over; for taking it over in such quantities as you could reasonably expect that it would come over. Q. And is there a means provided for taking it out from there? A. Yes, sir. Q. Did you ever see any of it removed? A. I have seen a great deal removed. * * * Q. Do you know what the material was that passed over into the carbureter and was removed from that chamber? A. It is principally carbon. Q. How about that that was removed from under the grate-bars? A. That would have a certain proportion of ash in it, or dirt. It is not really an ash. It is really a dirt; but it answers to the name of ash—proportion to the ash in the fuel originally placed in the generator. * * * Q. When the fuel was porous, did you notice any increase of those deposits? A. I did. Q. To what extent? A. Different qualities of the same fuel each day, and some days it would be abnormally bad, and we would get more of this dust over. But just to what per cent. I would not be able to say. It would be, I should judge, about the same per cent. that the waste carbon would show to the carbon delivered. It would approximate the same. * * * Q. How long was the machine in operation after you arrived here on the 12th? A. Two days, I think. Q. And what happened at the expiration of the two days? A. We shut down the plant to clean out the carbureter, and to determine what the difficulty was with the machine. It was not properly balanced. We didn't seem to have it properly balanced at the time, and I closed it down, as we found that one trouble was with the carbureter. Q. What led you to believe there was trouble in the machine somewhere? A. The blast acting on that fire didn't seem to go through the fire, and didn't seem to come out through the superheater—the blast would be a lazy blast. There should have been a nice clear blast through the machine. Instead of that, in the stack valve it showed a very lazy flame—the red blast of the gases—indicating that the stoppage must be there in the generator itself, or some other part of the machine. Q. Did the variation in the make have anything to do with indicating that there was some defect? A. Oh, yes; that would also indicate it. Q. In what regard? A. In the make falling down it would indicate that there was generator trouble. Q. And after you shut down what did you discover? A. We discovered that the trouble was in the carbureter, and that it was blocked up or choked up with carbon and carbon dust. Q. Do you know where it came from? A. There is only one place it could come from, and that would be the generator, and partly from the oil sprays. The oil coming in contact with this dust would apparently form a cake in there, and fall down to the openings between the brick and close them up. They would adhere to the side and gradually close them up. Q. Do you know what caused the dust to be blown over into the carbureter? A. By the air blast which was applied to the generator to consume fuel. Q. Did the condition of the fuel that was passed into the generator have anything to do with it? A. It had everything to do with it. The fuel coming in there in the form of dust, and this dirt picked up by this blast and carried over to such an extent that it filled up the carbureter with dust."

The testimony of the witness White, and indeed that of some of the plaintiff's own witnesses, strongly corroborates the testimony of the witness Pederson in the respects indicated.

[2] In Empire State-Idaho Mining & Developing Co. v. Bunker Hill & Sullivan Mining & Concentrating Co., 114 Fed. 417, 52 C. C. A. 219, we said:

"The record contains a bill of exceptions embracing, among other things various assignments of error, the second, third, fourth, and fifth of which are

to the effect that the trial court erred in making certain of its findings of fact, which findings of fact so complained of these assignments of error respectively set out at large. The sixth, seventh, eighth, ninth, tenth, eleventh, twelfth, thirteenth, fourteenth, fifteenth, sixteenth, seventeenth, eighteenth, nineteenth, and twentieth assignments of error are to the effect that the court below erred in refusing to make certain findings of fact requested by the defendant to the action. It is very clear that these assignments are unavailing. Where a case is tried by the court without a jury, its findings upon questions of fact are conclusive in the appellate court. Only rulings upon matters of law, when properly presented in a bill of exceptions, can be considered here, in addition to the question, when the findings are special, whether the facts found are sufficient to sustain the judgment rendered"—citing Stanley v. Supervisors, 121 U. S. 535, 547, 7 Sup. Ct. 1234, 30 L. Ed. 1000; Distilling & Cattle Feeding Co. v. Gottschalk Co., 13 C. C. A. 618, 66 Fed. 609; Cable Co. v. Fleischner, 14 C. C. A. 166, 66 Fed. 899; Consolidated Coal Co. of St. Louis v. Polar Wave Ice Co., 45 C. C. A. 638, 106 Fed. 798.

In the present case there is no assignment of error calling in question any ruling of the trial court in respect to the admission of evidence, and therefore we cannot consider whether or not any of the evidence on which the findings of the court below were based was improperly admitted. It is a sufficient answer to the complaint of the plaintiff in error that the court failed to give the plaintiff judgment for a return of the $823.45 to say that such right was by the contract made to depend upon the failure of the construction company to bring the apparatus to a gas-making capacity of more than 2,000,000 cubic feet every 24 hours in the test provided for, which test the court found was never made by reason of the fault of the plaintiff. Still clearer is it that the plaintiff in error cannot be heard to complain that the court below adjudged that the defendant to the action take nothing by reason of its cross-complaint.

The judgment is affirmed.